DECISION
{¶ 1} On August 18, 2003, defendant-appellant, Reginald Draughon, filed an application to reopen his appeal and the judgment of this court rendered on May 29, 2003, in State v. Draughon, Franklin App. No. 02AP-895, 2003-Ohio-2727. The state opposes the motion.
 {¶ 2} On September 24, 2002, the Franklin County Grand Jury returned a 13-count indictment against defendant. Defendant was tried on the indictment before a jury in May 2002. At the close of the evidence, the court dismissed counts four, nine, and ten. (Tr. 197.) After deliberation, the jury returned verdicts of guilty on five counts of the indictment, namely, on counts one, two, six, seven, and eight. The jury returned not guilty verdicts on counts three, five, eleven, twelve, and thirteen. Regarding the counts upon which defendant was convicted, count one alleged gross sexual imposition, a violation of R.C. 2907.05, and a felony of the third degree. Counts two, six, seven, and eight alleged rape, violations of R.C. 2907.02, all felonies of the first degree.
 {¶ 3} Count one of the indictment alleged that the gross sexual imposition occurred from on or about August 1, 1993, to October 31, 1993, and that defendant had sexual contact with Kieauna Fuqua when she was less than thirteen years of age, to wit: seven years of age. Count one of the indictment was not amended.
 {¶ 4} Count two of the indictment initially alleged that a rape had occurred from on or about August 1, 1993, to November 30, 1993, and that defendant did engage in sexual conduct with Kieauna Fuqua, to wit: vaginal intercourse and/or anal intercourse and/or cunnilingus when Kieauna Fuqua was less than thirteen years of age, to wit: seven years of age. At the close of the evidence, the court sustained the state's motion to amend count two to read that the rape had occurred from on or about October 1, 1993, to November 30, 1993. (Tr. 199.)
 {¶ 5} Count six of the indictment initially alleged that a rape had occurred from on or about August 1, 1993, to July 1, 1994, and that defendant, without privilege to do so, did insert any part of the body, or any instrument, apparatus, or other object into the vaginal cavity of Kieauna Fuqua when she was less than thirteen years of age, to wit: seven to eight years of age. At the close of the evidence, the court sustained the state's motion to amend count six to read that the rape had occurred from on or about December 1, 1993, to February 1, 1994. (Tr. 200.)
 {¶ 6} Counts seven and eight of the indictment initially alleged that rapes had occurred from on or about December 1, 1993, to December 31, 1993, and that defendant did engage in sexual conduct, to wit: vaginal intercourse and/or anal intercourse and/or cunnilingus with Kieauna Fuqua when she was less than thirteen years of age, to wit: seven to eight years of age. At the close of the evidence, the court sustained the motion to amend counts seven and eight to read that the rapes had occurred from on or about December 31, 1993, to January 31, 1994. (Tr. 200.)
 {¶ 7} On his appeal, defendant asserted a single assignment of error:
The trial court erred in polling the jury on incorrect verdicts, thereby depriving Appellant of his right to a fair trial as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and comparable provisions of the Ohio Constitution.
 {¶ 8} On May 29, 2003, this court overruled defendant's single assignment of error and affirmed the judgment of the Franklin County Court of Common Pleas. In his application for reopening the appeal, defendant proposes three assignments of error:
[I.] AN accused's due process rights are violated under art. I section10 of the Ohio constitution and the fifth and fourteenth amendments to the united states constitution, when the trial court enters judgment against the accused, when the evidence was insufficient to sustain a conviction and was not supported by the manifest weight of the evidence.
[II.] Whether appellate counsel was ineffective for failure to raise abuse of discretion on trial court for allowing inadmissible evidence and testimony by an expert witness for the exclusive purpose to bolster the alleged victim's testimony.
[III.] Whether appellate counsel was ineffective for failure to raise the issue that the trial court unconstitutionally applied the Ohio's rape shield law in this case that denied appellant's right to confrontation and in turn, due process of law and a fair trial by the unreasonably [sic] restriction on cross-examination.
 {¶ 9} Under App.R. 26(B), a defendant in a criminal case may apply for reopening of the appeal based upon a claim of ineffective assistance of appellate counsel. The application for reopening shall be granted if there is a genuine issue as to whether the applicant was deprived of the effective assistance of counsel on appeal. App.R. 26(B)(5).
 {¶ 10} The two-pronged analysis found in Strickland v. Washington
(1984), 466 U.S. 668, 104 S.Ct. 2052, is the appropriate standard to assess whether defendant herein has raised a "genuine issue" as to the ineffectiveness of his appellate counsel. State v. Hooks (2001),92 Ohio St.3d 83, 84. Under Strickland, a defendant must prove that his appellate counsel was deficient for failing to raise the issue he now presents and that there was a reasonable probability of success had those claims been presented on appeal. Id., State v. Bradley (1989),42 Ohio St.3d 136.
 {¶ 11} Appellate counsel's performance was deficient if it was unreasonable under prevailing professional norms. Strickland, supra. Appellate counsel need not raise every nonfrivolous issue. Jones v.Barnes (1983), 463 U.S. 745, 752, 103 S.Ct. 3308. Counsel may limit the number of arguments raised in order to focus on those issues most likely to bear fruit. State v. Allen (1996), 77 Ohio St.3d 172, 173.
 {¶ 12} In our May 29, 2003 opinion, we did not have occasion to summarize the evidence in this case. Accordingly, having reviewed the transcript of the trial proceedings, we do so here.
 {¶ 13} At trial, the state called only two witnesses, Kieauna Fuqua ("Kieauna"), the victim of the crimes, and Gail Hornor ("Hornor") a pediatric nurse practicioner, who testified as an expert witness regarding an examination that she performed on Kieauna on August 18, 1999.
 {¶ 14} Kieauna was 16 years of age when she testified at trial. She was by then a sophomore high school student. She testified that she first met defendant during the summer of 1993 when he began dating her mother, Mary White ("White"). At that time, Kieauna was seven years old. In the summer of 1993, Kieauna, her mother, and Kieauna's brother and sister resided at Kieauna's grandmother's house. Kieauna's brother was three years old, and her sister was one year old at that time.
 {¶ 15} Kieauna testified that her first sexual encounter with defendant occurred during the summer of 1993 before school had started. She was upstairs watching television in her grandmother's bedroom, and so was defendant. Everyone else who lived there were downstairs in the kitchen. Initially, Kieauna and defendant were on the floor watching television. Then Kieauna got up to lay on her grandmother's bed. She was laying on her stomach under a blanket facing the television. Defendant put his hand underneath the blanket and starting rubbing Kieauna's "butt." (Tr. 29.) Upon hearing her mother ascending the stairs, Kieauna moved to the floor, and defendant got up and went downstairs. Later, defendant asked Kieauna if she liked it, and Kieauna told defendant "no." This incident, which we shall call the first incident, relates to count one of the indictment which alleges gross sexual imposition of which defendant stands convicted.
 {¶ 16} About two or three months after the first incident, Kieauna's mother and defendant obtained an apartment on the east side of Columbus. Kieauna, her mother, defendant, and Kieauna's younger brother and sister all moved to the apartment. This is where the second incident of sexual conduct occurred. Kieauna testified that it occurred in October of 1993 around Halloween. (Tr. 34.) Kieauna was laying on the living room floor watching television, and defendant was behind her also watching television. Kieauna's sister was also in the living room sleeping. Kieauna's mother was probably upstairs at the time. Defendant asked Kieauna if she "wanted to play a game," and Kieauna said "sure, why not." (Tr. 34.) Defendant then removed her pajamas and underwear and had vaginal intercourse with her. Afterward, defendant told Kieauna not to tell anyone and especially her mother because she would be jealous and upset. Defendant then went upstairs and Kieauna stayed downstairs and went to sleep. Kieauna did not tell anyone about this incident until many years later. This incident relates to count two of the indictment charging defendant with rape upon which he stands convicted.
 {¶ 17} The third incident which Kieauna described at trial relates to count five of the indictment alleging gross sexual imposition. The jury returned a verdict of not guilty as to count five. Kieauna testified that the third incident occurred about two or three days after the rape that had previously occurred. According to Kieauna's testimony, she was sitting on a couch with a blanket over her while watching television. Her mother was sitting in the same room on another couch, also watching television. Defendant came into the room and sat beside Kieauna and put the blanket over himself. According to Kieauna, defendant then took her hand, which was underneath the blanket, and placed it on his penis. According to Kieauna, her mother continued to watch television while this was going on.
 {¶ 18} The fourth incident, which Kieauna described at trial, relates to count three of the indictment charging defendant with rape. The jury returned a not guilty verdict as to count three. Kieauna testified that the fourth incident occurred a few days after the previous incident. According to Kieauna, she had fallen asleep downstairs late at night after watching television. Kieauna stated that defendant woke her up and said, "we were going to try something new." (Tr. 43.) Kieauna testified that defendant had a small container of Vaseline with him and "he rubbed it on my anal and he entered me with his penis." (Tr. 44.) Kieauna further testified that defendant then forced her to put her mouth on his penis.
 {¶ 19} At this point in Kieauna's direct examination, the following exchange occurred:
Q. [STATE]: Through all of the sexual contact that you have described that has happened up to this point, had you had any sexual contact with any other person?
A. [KIEAUNA]: No, I did not, never.
Q. [STATE]: No one, other than Mr. Draughon, had penetrated you vaginally?
[DEFENSE COUNSEL]: Objection. May we approach, your Honor?
(Tr. 47.)
 {¶ 20} Defendant's counsel then asserted to the court that "the state is violating the rape shield statute as to prior sexual contact." Id. The court overruled defendant's objection. The exchange continued:
Q. [STATE]: You can answer the question. No one had penetrated you vaginally?
A. [KIEAUNA]: No.
(Tr. 48.)
 {¶ 21} The fifth incident described by Kieauna relates to count six of the indictment of which defendant stands convicted. Kieauna testified that this incident occurred "weeks later" when she was upstairs in the bathroom after just taking a bath. (Tr. 48.)
 {¶ 22} As Kieauna was putting on her clothes, defendant knocked on the bathroom door, stating that he had to use the bathroom. He then pushed the door open, came into the room, and, using his fingers, penetrated her vagina. Kieauna heard her mother's footsteps moving toward the bathroom. At that point, defendant pulled his fingers out and started washing his hands. Kieauna remembered that this incident occurred around Christmas of 1993 because defendant had given her a Christmas gift that she wanted very much. (Tr. 54.)
 {¶ 23} Kieauna testified about another incident that she said occurred about two or three weeks after the previous incident. Kieauna was in the laundry room looking for some clothes to wear to school the next day. She was on her knees going through clothes. Her testimony regarding this incident relates to count three of the indictment. The jury returned a verdict of not guilty on count three.
 {¶ 24} Kieauna testified that while she was in the laundry room, defendant entered the room and showed her a photograph of one of his former girlfriends. According to Kieauna, defendant then stated, "[T]he things I did to her is the things I am doing to you. I did those things to her because I loved her." (Tr. 52.) Defendant then left the laundry room and returned with a small jar of Vaseline. Kieauna testified that he then pulled down her pants and underwear and penetrated her vagina with his fingers. Again, Kieauna's testimony regarding this incident in the laundry room relates to count three upon which the jury returned a verdict of not guilty.
 {¶ 25} Kieauna testified that the next incident (seventh incident) occurred "weeks after" the last incident. (Tr. 56.) She testified that it occurred after Christmas after her eighth birthday, which was December 27, 1993. (Tr. 56.) She also testified that it occurred sometime in 1994. This incident relates to counts seven and eight of the indictment of which defendant stands convicted. This incident began in the daytime when only Kieauna and defendant were at home. Kieauna was on the downstairs couch, and defendant told her to go upstairs. Kieauna told him she did not want to go upstairs. Kieauna complied after defendant told her again. Defendant told Kieauna to go to her mother's bedroom and to sit on the bed. Defendant removed all of Kieauna's clothing, scooted her to the edge of the bed and then put his mouth on her vagina. After defendant stopped doing that, he removed all of his clothing and penetrated her vagina with his penis. Kieauna testified that defendant was not wearing a condom and that when he pulled his penis out he ejaculated on the bed sheets. Kieauna, who was eight years old at the time, asked defendant "what was that," and defendant said, "this is the stuff that gets women pregnant." (Tr. 59.) After defendant put his clothing back on and told Kieauna to put her clothes back on, the telephone rang. It was Kieauna's mother. Defendant told Kieauna that she "better not say anything to anyone." Id. While Kieauna was speaking to her mother on the phone, defendant removed the bed sheets and took them downstairs to the laundry room and washed them. Defendant waited until the sheets were finished washing and then put them in the dryer. Kieauna did not tell her mother what had happened "[b]ecause I was afraid that she would be mad at me." (Tr. 60.) Again, this incident relates to counts seven and eight of the indictment, of which defendant stands convicted.
 {¶ 26} The next incident that Kieauna testified about was said to have occurred "about a month or two later" after the last incident. (Tr. 60.) This incident relates to counts eleven and twelve, upon which the jury returned not guilty verdicts. According to Kieauna, on this day, she was at home alone with defendant. She was already upstairs in her room. She went to her mother's bedroom to get something, not realizing that defendant was there. After telling her to take off her clothes, he then removed her shorts and underwear. Kieauna testified that he then put his mouth on her vagina. Kieauna further testified that defendant removed all of his clothing and penetrated her vagina with his penis. Again, this incident, testified to by Kieauna, relates to counts eleven and twelve of the indictment upon which the jury returned verdicts of not guilty.
 {¶ 27} Kieauna also testified about another incident that "occurred a few weeks later." (Tr. 62.) Kieauna was downstairs with her younger brother and sister. Her mother was not at home. Defendant told Kieauna to go upstairs. Kieauna ran and said, "I don't want to do this anymore." (Tr. 63.) According to Kieauna, she said, "Are you going to do this with my little sister because I don't want to do this anymore?" (Tr. 63.) Defendant got "very upset" and said, "no." According to Kieauna, "I told him that I was going to tell, but he was just like I don't care, no one was going to believe you." (Tr. 63-64.)
 {¶ 28} Kieauna further testified that defendant moved out of the apartment "about a month or two" after the last incident. "It had to be the beginning of the summer of '94." (Tr. 64.) According to Kieauna, defendant continued to live in their apartment for awhile after he and her mother "stopped dating" because he "didn't have anywhere to go." Id.
 {¶ 29} In October of 1998, Kieauna told a friend about the incidents with defendant. Her friend told Kieauna that she should speak to her friend's mother. Her friend's mother told Kieauna that she must tell her own mother. Kieauna told her mother, and her mother became very upset and angry.
 {¶ 30} Telling her mother ultimately resulted in Kieauna speaking to someone from Franklin County Children Services, and then to the police department in 1999. Kieauna received counseling regarding the incidents with defendant.
 {¶ 31} The second and last witness called by the state was Gail Hornor. Hornor is a pediatric nurse practitioner employed in the Child Abuse Program at Children's Hospital. She had been so employed at the time of trial for about eight or nine years. Her duties involve performing examinations related to allegations of sexual abuse. She had performed over 4,000 such examinations prior to trial.
 {¶ 32} Hornor has a Bachelor's degree in nursing from Franklin University and a Masters degree in nursing from Wright State University. She completed a pediatric nurse practitioner program at The Ohio State University. She is licensed by the state of Ohio as a registered nurse and she holds a certificate from the state of Ohio to practice as a pediatric nurse practitioner.
 {¶ 33} Following the witness voir dire, which involved queries into Hornor's qualifications as an expert and her anticipated testimony before the jury, defense counsel moved in limine that the witness be excluded from testifying. (Tr. 109.) The court overruled defendant's motion.
 {¶ 34} As previously noted, Hornor examined Kieauna on August 18, 1999, when Kieauna was some thirteen years and eight months old. During the examination, Hornor examined the genitalia using a colposcope, which is a magnification device. Hornor also inserted a Foley catheter into the vagina, inserted a balloon, and pulled back so that she could visualize the hymen. Hornor observed two "abnormalities." One was a tear or transection of the hymen. The other was a thinning or attenuation of the base of the hymen. Both the attenuation and the transection were located at "6:00 o'clock" at the base of the hymen. (Tr. 121.) Those two findings are "consistent with some form of penetrating injury." (Tr. 120.)
 {¶ 35} Hornor ruled out a "straddle injury" caused by a fall on a bicycle or something like that. (Tr. 121-122.) Hornor testified that a straddle injury involves a tear of the forchette, which is outside the hymen. The hymen is typically spared in a straddle-type injury.
 {¶ 36} Hornor photographed the hymen before and after insertion of the Foley and inflation of the balloon. Those two photorgraphs were submitted as State's Exhibit No. 1 and were shown to the jury.
 {¶ 37} Hornor further testified that the tear or transection was "at least three to four weeks old to a number of years old" at the time of the examination. (Tr. 125.)
 {¶ 38} The defense called two witnesses, Mary White, who is Kieauna's mother, and Curtis Jones ("Jones"), an acquaintance of defendant.
 {¶ 39} White testified that she was a crack cocaine user in 1992. She also abused alcohol. She testified that she started "recovery" in June 1992, but there have been "relapses" involving alcohol and "some other drugs." (Tr. 170.) She believes that her use of drugs and abuse of alcohol have affected her ability to remember events. Id.
 {¶ 40} White met defendant "in recovery at a meeting." (Tr. 151.) According to White, "it had to be '92." Id. She was living with her mother at the time. She recalled that she began dating defendant "[t]he year of 1992, somewhere around August." (Tr. 151.)
 {¶ 41} At trial, following the above testimony, the following exchange occurred:
Q. [DEFENSE COUNSEL]: And did you two ever get a place of your own?
A. [WHITE]: Yes, we did.
Q. [DEFENSE COUNSEL]: Prior to that you used to live with your mother with your children from the time you started dating Mr. Draughon until you got your own place. When was that?
A. [WHITE]: Which one are you talking about?
Q. [DEFENSE COUNSEL]: Your first place with Mr. Draughon.
A. [WHITE]: '93.
Q. [DEFENSE COUNSEL]: When was that in '93; do you remember?
A. [WHITE]: I just remember it was the summer. Well, it was in '92. Because I remember '93 distinctly because we went to an event together. That was the beginning of the year. So, I know in '92 we moved in together.
Q. [DEFENSE COUNSEL]: '92?
A. [WHITE]: '92, yes.
Q. [DEFENSE COUNSEL]: Now, do you recall what part of the time of the year, or what season of the year?
A. [WHITE]: It was warm when we moved.
Q. [DEFENSE COUNSEL]: Had you got an apartment with him?
A. [WHITE]: Yes.
Q. [DEFENSE COUNSEL]: That could be July, August, September?
A. [WHITE]: I don't remember. I just know it was warm.
Q. [DEFENSE COUNSEL]: How long did you two stay together?
A. [WHITE]: I would say a good six months.
* * *
Q. [DEFENSE COUNSEL]: Did it last until the first of the next year?
A. [WHITE]: Yes.
Q. [DEFENSE COUNSEL]: It did?
A. [WHITE]: Yes.
Q. [DEFENSE COUNSEL]: Did it last any longer than that?
A. [WHITE]: No, it didn't.
Q. [DEFENSE COUNSEL]: You know that?
A. [WHITE]: Yes.
Q. [DEFENSE COUNSEL]: So, he moved out around the first of the year after you guys got your apartment.
A. [WHITE]: Yes.
Q. [DEFENSE COUNSEL]: You never moved back?
A. [WHITE]: No.
Q. [DEFENSE COUNSEL]: Never moved back in?
A. [WHITE]: No.
(Tr. 151-153.)
 {¶ 42} White testified that defendant's name was put on the lease of the apartment that they moved into together. Defendant had a key to the apartment and could come and go as he pleased. Defendant had no regular working hours. He had a job selling vacuum cleaners and set his own hours.
 {¶ 43} During White's testimony, the following exchange occurred:
Q. [DEFENSE COUNSEL]: Did she ever discuss her relationships with boys?
A. [WHITE]: No.
[THE STATE]: I am going to object on hearsay.
THE COURT: Sustained.
* * *
Q. [DEFENSE COUNSEL]: Did you ever tell people at AA that your daughter was dating?
[THE STATE]: Objection, irrelevant.
THE COURT: Sustained.
[DEFENSE COUNSEL]: Your Honor, they opened the door.
THE COURT: Would you like to approach?
THEREUPON, the following proceedings were held outside the presence and hearing of the jury:
[DEFENSE COUNSEL]: It is my opinion they specifically asked this girl if she had dated anybody else, had sexual relations with anybody else since these things took place. I am asking whether or not this girl dated.
THE COURT: Doesn't that go into the shield situation, though?
[DEFENSE COUNSEL]: They opened that door.
[THE STATE]: I am sorry. To make the record clear from our position, we asked if she had any prior sexual offenses because of the origin of the injury. Subsequent to then is irrelevant. We never opened the door with this woman's conversation with anybody.
[DEFENSE COUNSEL]: We are generally discussing the dating. We not talking about sex acts, judge.
[THE STATE]: I never asked about dating.
THE COURT: I don't think you can start down that road. I am going to sustain the objection.
(Tr. 159, 161-162.)
 {¶ 44} We shall first address defendant's third proposed assignment of error, which alleges that defendant's appellate counsel was ineffective for failing to raise an issue regarding Ohio's rape shield law. We find that defendant has failed to raise a genuine issue as to whether defendant was deprived of effective assistance of counsel regarding Ohio's rape shield law.
 {¶ 45} R.C. 2907.02(D), Ohio's rape shield statute, states:
Evidence of specific instances of the victim's sexual activity, opinion evidence of the victim's sexual activity, and reputation evidence of the victim's sexual activity shall not be admitted under this section unless it involves evidence of the origin of semen, pregnancy, or disease, or the victim's past sexual activity with the offender, and only to the extent that the court finds that the evidence is material to a fact at issue in the case and that its inflammatory or prejudicial nature does not outweigh its probative value.
 {¶ 46} In State v. Gardner (1979), 59 Ohio St.2d 14, the Supreme Court of Ohio rejected a constitutional challenge to the rape shield law on grounds that it denied the defendants their Sixth Amendment right to confrontation of witnesses and their right to a fair trial as secured by the Due Process Clause. The Garnder court stated:
Several legitimate state interests are advanced by the shield law. First, by guarding the complainant's sexual privacy and protecting her from undue harassment, the law discourages the tendency in rape cases to try the victim rather than the defendant. In line with this, the law may encourage the reporting of rape, thus aiding crime prevention. Finally, by excluding evidence that is unduly inflammatory and prejudicial, while being only marginally probative, the statute is intended to aid in the truth-finding process.
Id. at 17-18.
 {¶ 47} Defendant's issue centers primarily upon the trial court's ruling during the testimony of Kieauna's mother, Mary White. Defendant contends here that he called White to the stand "to testify that she had knowledge of her daughter's sexual activities prior to Gail Hornor's expert testimony." Presumably, defendant is contending that White was called to testify regarding Kieauna's sexual activities with boyfriends subsequent to the incidents with defendant and prior to her examination by Hornor on August 18, 1999, when Kieauna was almost thirteen years and eight months old.
 {¶ 48} The transcript reveals that, during White's testimony, defense counsel initially asked the witness, "Did she ever discuss her relationships with boys?" The state objected to the question on hearsay grounds, and the trial court sustained the objection. Thereafter, defense counsel asked, "Did you ever tell people at AA [Alcoholics Anonymous] that your daughter was dating?" The state objected on relevancy grounds, and the trial court sustained the objection. At that point, at a sidebar conference, defense counsel contended that the question regarding Kieauna's dating was proper because allegedly the state had previously inquired of Kieauna regarding "sexual relations with anybody else" subsequent to the incidents with defendant. The state responded that it had not "opened the door" by its questioning of Kieauna.
 {¶ 49} The transcript shows that the state was correct in stating that it had not "opened the door" for defense counsel's line of questioning into Kieauna's alleged dating. The transcript shows that on Kieauna's direct examination, the state asked her whether she had sexual conduct with any person other than the defendant up to the point when the incidents with defendant had occurred.
 {¶ 50} Kieauna's testimony that she had not had sexual contact with any other person up to the point when the incidents with defendant occurred did not "open the door" for defense counsel to introduce evidence regarding any sexual activity with any other person subsequent in time to the incidents with defendant.
 {¶ 51} Ohio's rape shield statute clearly precluded defense counsel from attempting to present evidence of Kieauna's alleged sexual activity with someone other than defendant subsequent to the incidents with defendant when Kieauna was seven or eight years old.
 {¶ 52} Accordingly, we find that defendant has failed to raise a genuine issue as to whether his appellate counsel was ineffective in failing to raise an issue with respect to the rape shield statute.
 {¶ 53} We shall next address defendant's second proposed assignment of error, which alleges that appellate counsel was ineffective for failing to raise as error the trial court's denial of defendant's motion in limine, which requested the exclusion of the testimony of Gail Hornor.
 {¶ 54} In support of his second proposed assignment of error, defendant cites State v. Price (1992), 80 Ohio App.3d 35. In Price, the defendant, Glenn Price ("Price") was convicted on a jury verdict finding him guilty of rape, attempted corruption of a minor, and gross sexual imposition, all concerning his 15-year-old stepdaughter. Over Price's objection, the trial court permitted Price's stepson, the brother of the prosecution witness, to testify generally that on other unspecified occasions, he had seen Price having sexual relations with another older stepdaughter. The instances of sexual conduct and contact with the older stepdaughter described by the stepson did not involve the prosecution witness. The trial court admitted the challenged testimony as evidence of other acts, citing R.C. 2945.59. The older stepdaughter did not testify at trial.
 {¶ 55} In Price, the court held that the testimony of the victim's brother concerning alleged acts between Price and the victim's sister was obviously intended to prove Price's character in order to show that he acted in conformity therewith concerning the crimes of which he was convicted. Such testimony was clearly inadmissible for any purpose and was prejudicial to Price.
 {¶ 56} Price assigned as error the trial court's failure to exclude the testimony of the prosecution's expert, Julie Sargel ("Sargel"), who was a "Children's Services worker." Sargel testified concerning patterns found in child sexual abuse and the symptoms of post-traumatic stress syndrome. Price did not challenge Sargel's qualifications as an expert. The Price court agreed that the purpose of Sargel's testimony was to strengthen the testimony of the prosecution's witnesses.
 {¶ 57} Sargel did not reach any conclusion during her testimony concerning whether or not the victim had been sexually abused. The Price
court quoted Evid.R. 702 relating to the testimony of experts.
 {¶ 58} The Price court concluded:
* * * Absent any evidence in the record disclosing a legitimate purpose for this testimony, we can only presume that it was introduced for the purpose of bolstering the testimony of the victim and her brother and, therefore, such testimony was inadmissible.
Id. at 42.
 {¶ 59} The scenario in Price with respect to Sargel's testimony as an expert witness is clearly inapposite to the instant case involving the testimony of Gail Hornor.
 {¶ 60} Evid.R. 702 states in part:
A witness may testify as an expert if all of the following apply:
(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons; * * *[.]
 {¶ 61} Hornor testified as a medical expert regarding her clinical observations and findings during her examination of Kieauna. She testified that there was evidence of a tear or transection of the hymen and also evidence of thinning or an attenuation of the hymen. She testified that those two findings are consistent with some form of penetrating injury. Hornor ruled out a straddle type of injury. She photographed the injury during the Foley procedure. She also opined that the injury was at least three to four weeks old and that it could have been a number of years old.
 {¶ 62} Hornor's testimony as a medical expert relates to matters beyond the knowledge or experience possessed by lay persons under Evid.R. 702. Hornor's testimony is unlike Sargel's testimony in thePrice case. Sargel was not a medical expert testifying about clinical findings during a medical examination. Sargel was a "Children's Services worker" whose testimony could not be admitted under Evid.R. 702. The purpose of Sargel's testimony, unlike the situation with Hornor here, was to bolster the testimony of the prosecution's witnesses.
 {¶ 63} Accordingly, defendant's reliance upon Price is misplaced.Price does not support defendant's contention that the trial court erred in permitting Hornor to testify.
 {¶ 64} We find to be instructive here the following pronouncement from the Sixth District Court of Appeals in State v. Esmond, Lucas App. No. L-01-1400, 2002-Ohio-2360, at ¶ 23:
A Boston [State v. Boston (1989), 46 Ohio St.3d 108.] problem arises when an expert witness attempts to invade the jury's factfinding province by offering an opinion as to another witness's credibility. State v.Yarber (1995), 102 Ohio App.3d 185, 195, 656 N.E.2d 1322. We do not, however, perceive any such incursion when an expert voices his or her opinion that observable data is consistent with a reported cause. Here, the physician testified that his examination of the victim revealed physical characteristics consistent with a blunt object being repeatedly inserted into her vagina, which was what the victim said had occurred. This is a clinical observation, not a comment on the victim's veracity.
Id.
 {¶ 65} Having reviewed the testimony of Gail Hornor as transcribed in the record, we do not perceive a Boston problem with her testimony.
 {¶ 66} Accordingly, we find that defendant has failed to raise a genuine issue as to whether his appellate counsel was ineffective in failing to raise an issue with respect to the testimony of Gail Hornor.
 {¶ 67} We shall now address defendant's first proposed assignment of error, which alleges that appellate counsel was ineffective for failing to assign as error that the evidence was insufficient to support the verdicts and that the jury verdicts were against the manifest weight of the evidence. The law pertinent to defendant's first proposed assignment of error is succinctly set forth by this court in State v.Norman, Franklin App. No. 03AP-298, 2003-Ohio-7038, wherein this court states:
An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. State v. Jenks (1991), 61 Ohio St.3d 259, at paragraph two of the syllabus.
Whether the evidence is legally sufficient is a question of law, not fact. State v. Thompkins (1997), 78 Ohio St.3d 380, 386. In determining the sufficiency of the evidence, an appellate court must give "full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." Jackson v. Virginia (1979),443 U.S. 307, 319, 99 S.Ct. 2781. As such, the weight of the evidence and the credibility of the witnesses are issues primarily determined by the trier of fact. State v. Yarbrough, 95 Ohio St.3d 227, 2002-Ohio-2126, at ¶ 79; State v. Thomas (1982), 70 Ohio St.2d 79.
A manifest weight argument is evaluated under a different standard. "The weight of the evidence concerns the inclination of the greater amount of credible evidence offered in a trial to support one side of the issue rather than the other." State v. Brindley, Franklin App. No. 01AP-926, 2002-Ohio-2425, at ¶ 35. In order for a court of appeals to reverse the judgment of a trial court on the basis that the verdict is against the manifest weight of the evidence, the appellate court must disagree with the fact-finder's resolution of the conflicting testimony.Thompkins, supra, at 387. The evidence is not construed most strongly in favor of the prosecution. State v. Conley (Dec. 16, 1993), Franklin App. No. 93AP-387. The court engages in a limited weighing of the evidence to determine whether there is sufficient competent, credible evidence that could convince a reasonable trier of fact of the defendant's guilt beyond a reasonable doubt. Id. The discretionary power to grant a new trial based on the conviction being against the manifest weight of the evidence" should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." State v. Martin (1983),20 Ohio App.3d 172, 175.
Id. at ¶ 23-25.
 {¶ 68} Defendant's proposed first assignment of error focuses on some of the testimonial evidence that, if believed, would undermine the alleged time frame for the rapes that occurred with respect to counts seven and eight on which defendant stands convicted. As previously noted, counts seven and eight of the indictment were amended at trial so that the rapes are alleged to have occurred from on or about December 31, 1993, to January 31, 1994.
 {¶ 69} Defendant contends that the testimony of Kieauna's mother is in conflict with Kieauna's testimony as to when the rapes alleged in counts seven and eight occurred. White's testimony in that regard has been previously set forth. White initially remembered that she and defendant moved out of her mother's house and into their own place in the summer of 1993. (Tr. 152.) She then changed her recollection of that event to the summer of 1992. She then said she remembered that it was 1993 "distinctly because we went to an event together." However, the "event" was never identified. She then reasserted that the event occurred in 1992. White later testified under cross-examination that she thinks her use of drugs and abuse of alcohol have affected her ability to recall events.
 {¶ 70} Needless to say, the jury was not required to give any weight to White's recollections as to when she and defendant moved out of her mother's house and into an apartment of their own.
 {¶ 71} Defendant also suggests that the testimony of Curtis Jones undermines the time frame for the rapes alleged in counts seven and eight. On direct examination by defense counsel, Jones testified that Johnny Walker ("Walker") was his cousin, and that defendant lived with Walker beginning the first of January 1994 until the end of the year. (Tr. 175.) According to the testimony, Walker died of AIDS in April 1995.
 {¶ 72} On cross-examination, Jones admitted that he never resided with Walker. Jones testified that he visited Walker "a lot," but he did not do so every night. (Tr. 179.) Jones spent the night at Walker's house "on a few occasions." (Tr. 176.) Jones testified that he was a friend of the defendant, but he did not know who defendant was dating at that time.
 {¶ 73} Clearly, Jones's testimony did not compel the jury to conclude that defendant could not have committed the rapes alleged in counts seven or eight.
 {¶ 74} In furtherance of his contention that the time frame alleged in counts seven and eight of the indictment, as amended, is not supported by the evidence, defendant suggests that it was Kieauna's testimony that the rapes "occurred sometime in the spring or summertime of 1994." (Defendant's memorandum, at 5.) We disagree with defendant's suggestion that the jury was compelled to conclude from Kieauna's testimony that the rapes alleged in counts seven and eight occurred in the spring or summer of 1994.
 {¶ 75} Kieauna's testimony at trial was presented as a series of incidents involving sexual contact with defendant. The time that a specific incident occurred is sometimes identified by Kieauna as having occurred within a specified period of time following the previous incident.
 {¶ 76} According to Kieauna's testimony, the first incident occurred during the summer of 1993 when she was upstairs watching television at her grandmother's house. On that occasion, defendant started rubbing her "butt."
 {¶ 77} The second incident occurred in October 1993 near Halloween. The second incident involved rape, of which defendant stands convicted.
 {¶ 78} The third incident was said to have occurred about two or three days after the second incident. This was the incident in which defendant is alleged to have moved Kieauna's hand to his penis under a blanket while they sat on a couch watching television.
 {¶ 79} The fourth incident was said to have occurred a few days after the third incident. The fourth incident is the one in which defendant is alleged to have anally penetrated Kieauna.
 {¶ 80} The fifth incident was said to have occurred "weeks later" when Kieauna was upstairs in the bathroom after taking a bath. Kieauna alleged that defendant digitally penetrated her vagina in the fifth incident. Kieauna remembers that this incident occurred around Christmas because she had received a gift from defendant that she really wanted.
 {¶ 81} The sixth incident was said to have occurred about two or three weeks after the previous incident and after Christmas. This incident allegedly occurred in the laundry room while Kieauna was looking for clothes to wear to school.
 {¶ 82} The next incident involves counts seven and eight, at issue here. This incident is said to have occurred "weeks after" the last incident, after Christmas and after Kieauna's eighth birthday on December 27, 1993, and sometime in 1994. This incident involved both rapes that occurred when defendant told Kieauna to go upstairs to her mother's bedroom. The rapes involved cunnilingus and vaginal intercourse. Kieauna remembered that defendant washed the bed sheets afterward. During Kieauna's testimony regarding the incident relating to counts seven and eight, the following exchange occurred:
Q. [THE STATE]: Do you remember what you were wearing?
A. [KIEAUNA]: It was getting a little bit warm out. So, I would say shorts and a shirt and underwear.
(Tr. 57.)
 {¶ 83} Perhaps the above exchange prompted defendant here to assert that: "Counts 7 8 allegedly occurred sometime in the spring or summertime of 1994." (Defendant's memorandum, at 5.) However, we do not believe that the above-noted exchange, read in the context of Kieauna's complete testimony, compels the conclusion that the incident relating to counts seven and eight occurred in the spring or summer of 1994, as defendant here asserts.
 {¶ 84} As previously noted, Kieauna specifically remembered that the fifth incident, involving digital penetration in the bathroom, occurred around Christmas of 1993. The sixth incident occurred in the laundry room two or three weeks after Christmas. The next incident, the one at issue here relating to counts seven and eight, was said to have occurred "weeks after" the last incident, which could place the incident in January 1994.
 {¶ 85} We recognize that Kieauna's testimony that she was wearing shorts due to warmer weather suggests that the incident may have occurred during a month other than January 1994. However, the jury was not compelled to place greater weight on Kieauna's testimony regarding the warmer weather than her testimony as to the sequencing of the incidents.
 {¶ 86} Taking Kieauna's testimony as a whole, we conclude that it supports a jury finding that the rapes involving counts seven and eight occurred during January 1994 as alleged in the amended indictment.
 {¶ 87} It is well-settled that, particularly in cases involving sexual misconduct with a child, the precise times and dates of the alleged offense or offenses oftentimes cannot be determined with specificity. State v. Daniel (1994), 97 Ohio App.3d 548, 556, citing Statev. Barnecut (1988), 44 Ohio App.3d 149. In many cases involving child sexual abuse, the victims are children of tender years who are simply unable to remember exact dates and times, particularly where the crimes involve a repeated course of conduct over an extended period of time.State v. Mundy (1994), 99 Ohio App.3d 275, 296, citing Barnecut, supra. See, also, State v. Pressley, Franklin App. No. 02AP-1354,2003-Ohio-6069, at ¶ 59.
 {¶ 88} Based upon our review of the record, we conclude that defendant has failed to raise a genuine issue as to whether his appellate counsel was ineffective in failing to raise issues with respect to the sufficiency of the evidence or the manifest weight of the evidence.
 {¶ 89} Accordingly, defendant's application to reopen his appeal is denied.
Application to reopen denied.
Brown and Klatt, JJ., Concur.