[Cite as *State v. T.E.H.*, 2017-Ohio-4140.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT


| | | |
|---|---|---|
| State of Ohio, | : | No. 16AP-384 |
| | | (C.P.C. No. 15CR-2461) |
| Plaintiff-Appellee, | : | No. 16AP-385 |
| | | (C.P.C. No. 15CR-2462) |
| v. | : | No. 16AP-386 |
| | | (C.P.C. No. 15CR-4300) |
| [T.E.H.], | : | |
| | | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on June 6, 2017

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Barbara A. Farnbacher*, for appellee. **Argued:** *Barbara A. Farnbacher*.

**On brief:** *Todd W. Barstow*, for appellant. **Argued:** *Todd W. Barstow*.

APPEALS from the Franklin County Court of Common Pleas

SADLER, J.

{¶ 1} Defendant-appellant, T.E.H., appeals from three judgment entries of the Franklin County Court of Common Pleas finding appellant guilty of multiple counts of rape with sexually violent predator specifications, gross sexual imposition with sexually violent predator specifications, unlawful sexual conduct with a minor, importuning, and disseminating matter harmful to a minor. For the following reasons, we affirm the judgments of the trial court.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2} This case involves the appeal of appellant's convictions in three cases involving separate child victims. In case No. 15CR-2461 (16AP-384), appellant was

indicted on ten counts of rape with sexually violent predator specifications for his alleged sexual conduct with R.H., who was 11 years old at the time of the conduct. In case No. 15CR-2462 (16AP-385), appellant was indicted on three counts of rape with sexually violent predator specifications, three counts of gross sexual imposition with sexually violent predator specifications, and three counts of importuning, all involving A.Y., who was 9 or 10 years old at the time of the incidents. In case No. 15CR-4300 (16AP-386), arising from appellant's alleged actions with 13-year-old C.S., appellant was indicted on six counts of rape with sexually violent predator specifications, six counts of unlawful sexual conduct with a minor, and three counts of disseminating matter harmful to juveniles.

{¶ 3} The trial court granted the motion of plaintiff-appellee, State of Ohio, to join the three cases for trial. The jury trial commenced March 22, 2016, and appellee commenced its case-in-chief.

{¶ 4} C.S. testified that his birthdate is January 27, 1988. In 2011, when he was 13 years old, he lived with his grandmother, who was his guardian, and his sister, who was a year or so older than him. His father lived in Florida and his mom passed away in either 2010 or 2011. He was bullied in school. Kids picked on him for living with his grandmother, and because she did not have much money, he wore the same clothes to school several times a week.

{¶ 5} C.S. was introduced to appellant by his sister in 2011. At that time, C.S. did not have many friends, and he had never had a male figure in his life. He went over to appellant's house several times "from March to September at least" and estimated that he saw appellant over one hundred times. (Tr. at 604.) Appellant treated him like a little brother, like "part of the family." (Tr. at 606.) Appellant bought C.S. several things, such as a cell phone and clothing, took C.S. shopping at the mall and a concert in Cleveland, and bought him a season pass to Kings Island. Appellant paid C.S.'s phone bill.

{¶ 6} According to C.S., in exchange for what appellant bought him, appellant wanted sexual favors. The first time this happened, appellant had bought him a lot of clothes at the mall and, shortly thereafter, told C.S. that he wanted C.S. to let him do sexual acts as a way of paying him back. C.S. was confused and did not really know what he meant. At appellant's house, appellant asked him to pull down his pants, which

appellant did, and appellant began sucking his penis until C.S. ejaculated.  Appellant told him it was alright and nothing was wrong with doing it and that it felt good and was natural.

{¶ 7}  C.S. testified that this happened frequently over a six-month period of time, where nearly every weekend there would be some kind of sexual favor.  Appellant also asked C.S. to have anal sex with him and helped C.S. put a condom on.  C.S. did not want to have sex with appellant but thought if he did not do it appellant would get mad and take his stuff away.  Appellant also asked C.S. to touch appellant's penis and go up and down, which C.S. did.  C.S. testified that "[a]bout three times" appellant had pornography playing on his TV or iPad while C.S. was present in the room.  (Tr. at 610.)

{¶ 8}  Appellant would often drive C.S. to the home of appellant's cousin, S.H., where A.Y. lived.  C.S. did not really hang out with A.Y. and described A.Y. as mentally challenged, "never was always there in his head."  (Tr. at 623.)  The sexual favors occurred in S.H.'s home as well as appellant's bedroom.

{¶ 9}  According to C.S., appellant kept a spreadsheet-type of list on his computer keeping track of what appellant bought for C.S., what C.S. owed him, and "chores," meaning sexual favors, that C.S. performed to pay off his debt.  (Tr. at 620.)  Appellant would sometimes get mad at C.S. when he would not come over and would say he would take away stuff from him, like the phone.

{¶ 10} C.S. testified that the last time a sexual act occurred, appellant drove C.S. to a bridge and performed oral sex on C.S.  After the bridge incident, C.S. reported what was happening to school personnel and spoke to a detective.  At the time, C.S. stated he was scared and confused about everything and just wanted it to be over with and did not want to be around appellant anymore.  Because of what appellant did, C.S. was confused about sex and did not know what was right and wrong.  C.S.'s grandmother could not really drive and had problems getting C.S. to places the detective wanted him to go, so the case "kind of just got dropped."  (Tr. at 634.)  C.S. was okay with that because he just wanted to forget it ever happened to him.  C.S. has been in counseling since he was 14 years old and now understands that it was not his own fault and that he was "being used" and "t[a]ken advantage of" by appellant.  (Tr. at 608.)

{¶ 11} Mary Zimmerman, a social worker contracted to provide mental health support for the school district where C.S. attended middle school, testified that C.S. disclosed sexual abuse to her in September 2011. Zimmerman had known C.S. from working with him since his sixth grade school year and was listed on his "individual education plan" for emotional disturbance. (Tr. at 528.) In the beginning of his eighth grade year, C.S., who was upset and pacing, disclosed that appellant had touched his private parts and had C.S. touch appellant's private parts. C.S. stated that appellant would keep track of how much money C.S. owed him for things appellant bought C.S. and would reduce that amount after a sex act. As a mandated reporter, Zimmerman contacted Franklin County Children Services and also called the police and C.S.'s grandmother.

{¶ 12} Jennifer (Westgate) Sherfield, MSW, LISW-S, a social worker employed as a forensic interviewer and mental health advocate at the Center for Family Safety and Healing at Nationwide Children's Hospital, testified to conducting an interview with C.S. (as well as R.H., as discussed later in this opinion). Sherfield explained that "[g]rooming and conditioning" are terms used to describe how perpetrators introduce children to the patterns of sexual abuse by, for example, befriending and giving a child things in exchange for sexual acts and introducing sexual acts incrementally. (Tr. at 458.)

{¶ 13} During the interview, C.S. told Sherfield that he met appellant because his sister was dating appellant's nephew, that he was being bullied at school, and that kids were calling him gay. C.S. reported that during the summer 2011, appellant would give him stuff and would want sexual favors in return. C.S. described sexual favors as meaning oral sex where appellant would give C.S. a "blow job." (Tr. at 478.) Appellant would treat the sex act as money; appellant would keep track on a list on a computer the "chores" equating to sex acts and a money amount and would let C.S. know what he "owed" for the things appellant bought him. (Tr. at 478.) C.S. reported that for the sexual favors, appellant gave him clothes, a generic iPad, and an iPod Nano, took C.S. to a concert in Cleveland, and gave C.S. a cell phone and put C.S. on his family plan.

{¶ 14} Sherfield testified that C.S. said the first incident occurred after appellant took C.S. to a mall, bought him shoes, clothes, and "perfume." (Tr. 479.) When they returned to appellant's house, appellant told C.S. that C.S. owed him money for the things that he bought. When C.S. told appellant he did not have any money, appellant told C.S.

that he would have to give him sexual favors. C.S. then told Sherfield that appellant "put his mouth on [my] private part and sucked my dick." (Tr. at 480.) C.S. reported that this happened more than once—pretty much every weekend that he hung out with appellant. He hung out with appellant nearly every weekend of the summer. C.S. reported that appellant "wanted [him] to sperm in [appellant's] mouth" because appellant told him he likes the taste. (Tr. 485.) C.S. additionally reported to Sherfield that he sucked appellant's penis once or twice, that "[appellant] made me have sex with his butt" three times, and that appellant had a medical issue where he "can't get hard." (Tr. at 482.) C.S. said that appellant had gay porn on his iPad and that sometimes appellant would turn on pornography when they were having oral sex. C.S. denied that anyone had taken his picture without clothes on or sent him pictures of themselves without clothes.

{¶ 15} In the interview, C.S. told Sherfield that he did not say anything back to appellant when appellant told him to do sexual acts "because he was scared and thought [appellant] would hurt him." (Tr. at 483.) C.S. denied that appellant or anyone else threatened to hurt him. C.S. reported that appellant was always cautious when he did things and smart about it to not get caught, for example, not talking over the phone about the sexual favors.

{¶ 16} Sherfield testified that C.S. told her the last incident of sexual conduct occurred when appellant gave C.S. a blow job in a car under a bridge. C.S. expressed to Sherfield that after the incident he had a bad nightmare that appellant was going to kill him, and C.S. then told his grandmother about what had happened and she told him he was not allowed to talk to appellant anymore.

{¶ 17} Detective Kevin Foos testified that in 2011 he served as a detective in the Franklin County juvenile division and that he was the primary investigator of C.S.'s allegation of sexual abuse against appellant in 2011. Foos spoke with the school counselors and appellant, observed C.S.'s interview at Children's Hospital, and spoke separately to C.S. Foos testified that C.S.'s description to him was consistent with his interview at Children's Hospital and with what he told school counselors. According to Foos, C.S. stated that appellant, whose date of birth is April 16, 1968, performed oral sex on C.S. around 30 times and that appellant gave him an iPad and Nano but lost them, and gave him a phone that C.S. gave away. Foos obtained a search warrant for appellant's

computer and seized the computer. Before receiving the results of the computer analysis, Foos closed the case due to a lack of corroboration and transferred out of the juvenile unit in September or October 2012.

{¶ 18} R.H. testified that his birthdate is September 17, 2002. When he was around 11 years old, R.H. would attend church with his deceased father's former partner, who introduced him to appellant. R.H. became very good friends with appellant's cousin or nephew, G.C.,[1] who he thought was about his age.

{¶ 19} From the end of the school year in 2014 through the whole summer and sometime after his 12th birthday, R.H. would go over to appellant's house to spend the night. R.H. thought appellant was a fun, cool guy; appellant bought R.H. season passes to and took him to amusement parks, bought him shirts, underwear, and expensive athletic shoes that his mom could not afford, and took him to a shopping mall and clothing stores. G.C. would go with them on the various outings. R.H. also testified that appellant gave him an iPhone and a tablet and that appellant broke the tablet when appellant got mad at R.H.

{¶ 20} When R.H. would spend the night, R.H. would sleep on one of three beds, including appellant's bed with appellant. G.C. would sleep in the room as well in one of the smaller beds. R.H. testified that during this time, appellant was "sucking my penis." (Tr. at 345.) During the first incident, around the time school let out in June 2014, appellant and R.H. were laying on appellant's bed. G.C. left the room to take a shower, and appellant told R.H. to take off all his clothes. R.H. did so, not knowing really what to do. Appellant began sucking on R.H.'s penis, R.H. told him to stop, and appellant did so. R.H. did not know the exact number of times appellant performed oral sex on him; he testified that it occurred "around the whole summer"—"from June to September"—almost every time he went over to appellant's house, a period which lasted sometime after his birthday. (Tr. at 353-54.) R.H. would tell him to stop almost every time, but appellant would not stop, which made R.H. angry. R.H. denied that appellant touched other parts of his body.

---

[1] The record is unclear regarding the familial relationship between appellant and G.C.; G.C. is most likely appellant's cousin.

{¶ 21} R.H. testified that he disclosed what happened to his father's former partner, who told R.H. to tell his mom. Sometime around his 12th birthday, R.H. told his mother "that [appellant] raped me." (Tr. at 343.) According to R.H., appellant told R.H. that he had a list of other kids who he had touched. R.H. denied knowing A.Y. or C.S.

{¶ 22} On cross-examination, R.H. agreed to remembering an incident in which his father's former partner played a pornographic DVD of men engaged in sexual activity about the time R.H. was interviewed by Children's Hospital regarding appellant. R.H. denied that his father's former partner ever had touched him or asked him to do anything of a sexual nature.

{¶ 23} Sherfield, the Nationwide Children's Hospital social worker, testified to conducting a forensic interview with R.H. According to Sherfield, R.H. reported that appellant gave him oral sex "around 15 to 16 times" in exchange for things such as season passes to amusement parks, clothes, and an iPad. (Tr. at 457.) R.H. reported that sperm went in appellant's stomach. During the interview, R.H. told Sherfield that appellant became angry and smashed the iPad after R.H. said he could not be doing this anymore and that appellant told him to "take it to the grave." (Tr. at 461.) R.H. denied to Sherfield that appellant touched him anywhere else on his body or that R.H. touched appellant. R.H. reported seeing a list above appellant's bed entitled " 'People I Touched' with dudes' names." (Tr. at 462.)

{¶ 24} The sexual assault nurse examiner at Nationwide Children's Hospital, Gail Horner, testified to conducting the physical examination for R.H. on November 25, 2014, and that the examination of R.H. was normal and did not reveal physical findings of trauma or sexually transmitted diseases. Horner testified that, in her experience, she would not expect any physical findings based on R.H.'s reported histories. She noted that the majority of children they see for sexual abuse show no physical findings during the exam and testified that a man putting his mouth around a boy's penis is typically not going to leave any physical findings, and touching with the hands would be even less likely than a mouth to leave any physical findings.

{¶ 25} Detective Brian Sheline, an officer with the Columbus Division of Police assigned to investigate child sexual abuse allegations, testified to receiving information and a referral from Children Services in November 2014 about abuse concerns involving

R.H.  Sheline obtained a search warrant for appellant's home, and in early December 2014, went to appellant's home to attempt to speak with appellant.  Appellant allowed Sheline into his bedroom, which included one adult size bed and two child size beds. Sheline produced the warrant and searched and photographed the bedroom, finding, among other items, a notebook with a list of names entitled "People That I've Touched," "coming of age" books for young boys, and pornographic DVDs.  (Tr. at 142, 144.)

{¶ 26} In speaking with appellant, Sheline learned of the previous 2011 investigation of appellant by the Franklin County Sheriff's Office involving allegations made by C.S.  Sheline contacted an investigator in the sheriff's office regarding that prior investigation and interviewed C.S.  Detective Joe Schluer, an officer with the Franklin County Sheriff's Office assigned to handle juvenile sex crimes, testified he was contacted by Sheline, and Schuler submitted the computer recovered in the C.S. investigation for analysis.

{¶ 27} Sheline obtained a warrant for appellant's arrest.  Officer Charles Distelhorst of the Columbus Division of Police testified to executing the warrant at appellant's home sometime after 11:00 p.m. on May 11, 2015.  According to Distelhorst, after appellant's roommate let them in the house, Distelhorst and several other officers proceeded upstairs to appellant's bedroom.  As they went up the stairs, Distelhorst noticed a camera on top of appellant's bedroom door pointing down the stairs. Distelhorst knocked and opened the unlocked door.  Appellant was lying on a bed under the covers, and a child of about ten years in age, A.Y., was lying on the same bed under the covers.  Appellant had underwear and a t-shirt on, and A.Y. wore underwear only.  A third young man in pajamas was in the room on a small bed.  Appellant complied with Distelhorst's orders, and appellant was placed under arrest.  A.Y. was taken to Nationwide Children's Hospital, and the officers called Sheline to meet A.Y. at the hospital.

{¶ 28} At the hospital, Emily Combs, MS, LISW, LCSW, a forensic interviewer, interviewed A.Y. at approximately 2:00 a.m. and, shortly thereafter, wrote a report based on that interview.  Her first impression of A.Y. was that he was possibly developmentally delayed.  Combs testified that A.Y.'s medical history included a diagnosis of post-traumatic stress disorder after witnessing his mom commit suicide and was being treated

with medication and counseling for that condition. As with R.H., A.Y.'s physical examination at Children's Hospital was normal.

{¶ 29} According to Combs, in the interview, A.Y. referred to appellant as his "cousin" and reported that he spends the night at appellant's house all the time and always sleeps in appellant's bed. (Tr. at 234.) A.Y. initially denied being sexually abused, which Combs testified often happens in her practice, before ultimately disclosing abuse to her. A.Y. reported that appellant has been "messing around with me in my gross parts" and pointed to his penis to indicate the location of his "gross parts." (Tr. at 234.) A.Y. reported that when he is asleep, he can feel appellant rubbing his penis on top of his clothes and that "[appellant] sucks on his penis and makes it hurt." (Tr. at 236.) A.Y. told Combs "[appellant] does it every day but I don't like it." (Tr. at 236.) A.Y. reported that appellant would only suck on his penis or touch his penis in appellant's room and said that appellant asked A.Y. to put his mouth on appellant's penis. In the interview, A.Y. reported that he was nine or ten years old the first time that appellant touched his body. A.Y. denied that anyone touched or put anything inside his bottom, denied seeing pornography, and denied seeing appellant touch anyone else. A.Y. reported to Combs that appellant told A.Y. not to tell anyone about the touching and to keep it a secret.

{¶ 30} In the interview with Combs, A.Y. talked about going to Walmart with appellant, getting things for the house, and then working on the house with him. A.Y. told Combs that appellant took him to Kings Island, bought him a YMCA membership and took him there in the summer, and bought him a nerf gun and a game from Game Stop. A.Y. did not want to stop seeing appellant because "he's fun," which Combs testified happens a lot with abused children who have a relationship of trust with the perpetrator and likes or loves that person. (Tr. at 236.)

{¶ 31} A.Y. testified at trial that he was born on July 6, 2004, and that he had repeated a grade in school at least once. His family knew appellant, and A.Y. thought he met appellant when he was nine or ten years old. A.Y.'s mom[2] would drop him off to spend the night at appellant's house on school nights and a couple of nights during the summer that he turned ten. A.Y. did not recall spending the night at appellant's house

---

[2] After the death of his birth mom, A.Y. lived with S.H. and T.H., who he refers to as his mother and father.

before he turned ten, and several times while testifying, A.Y. could not recall whether he turned ten in 2013 or 2014.  A.Y. stated his mom and dad did not have much money, and appellant took him shopping and to fun places and had bought him shoes, clothes, and a video controller.

{¶ 32} During those nights that A.Y. slept over at appellant's house, A.Y. would always sleep in appellant's room, in appellant's bed, and, at appellant's suggestion, would wear only underwear instead of his normal underwear and shorts.  Sometimes appellant's 13-year-old relative, G.C., would sleep in the room as well on a smaller bed.

{¶ 33} According to A.Y., "[a] couple years ago" from the date of the trial, when he was about ten years old, appellant asked to put his mouth on A.Y.'s "nuts," which A.Y. described as his private part where pee comes out of, and appellant told him it was not wrong and that A.Y. would like it.  (Tr. at 275, 277.)  A.Y. replied he was not going to do that, but appellant continued asking him, and A.Y. "was like no, no and no."  (Tr. at 277.)  A.Y. testified that appellant did touch A.Y.'s private parts with his hands and with his mouth, and the touching always occurred in appellant's room in the evening or night while A.Y. was lying in the same bed as appellant.  A.Y. testified that while he was "asleep," appellant would touch him and, every morning he woke up, A.Y. "felt something like on me, but * * * I didn't let him, though, but like when it was morning, he stopped and went over back to his other side."  (Tr. at 300.)  A.Y. stated that appellant touched A.Y. with his hand, and appellant's mouth touched his private parts "[a] couple times" and that it felt "gross," like he was in dirty water and his private parts would be wet.  (Tr. at 286, 293.)

{¶ 34} Regarding one incident, A.Y. testified that "when I was sleeping * * * I was laying on my back, then suddenly [appellant] came over to me, pulled my pants down and raped me. * * * [H]e put his mouth on my private and did something * * * that I don't like."  (Tr. at 284-85.)  A.Y. told him to stop, but appellant did not stop.  Another night when A.Y. spent the night, appellant put his hands in A.Y.'s pants and touched his private parts.  Appellant stopped touching him when it was daylight.  Appellant told A.Y. not to tell anybody about the touching, and A.Y. did not tell anyone because he did not want to get in trouble.  A couple of times when A.Y. spent the night, appellant would not put his

mouth on or touch A.Y.'s private parts.  A.Y. denied that appellant had touched him the night the police arrested appellant.

{¶ 35} Detective Thomas Clark, a digital forensics analyst with the Columbus Division of Police, testified to analyzing the recovered DVD, a memory card, an iPhone 6, and an iPad.  The DVD contained only family oriented photographs, the memory card contained family oriented photographs and deleted photographs of naked adult females, and the iPad included a large number of photographs of shirtless, younger males, which he characterized as provocative but not illegal in nature.  Regarding the iPhone 6, Clark testified that in his professional opinion, it was "remotely wiped" or erased of data before he could obtain and examine the data.  (Tr. at 400.)  Detective Aaron Greenburg, a police officer with the Franklin County Internet Crimes Against Children task force, conducted a forensic analysis of the computer recovered in the C.S. investigation.  He did not find a spreadsheet of the nature described by C.S.

{¶ 36} Appellee rested its case-in-chief.  Appellant moved for a judgment of acquittal under Crim.R. 29, which the trial court overruled.  Appellant then called one witness in his defense.

{¶ 37} A.P. testified to knowing appellant since he was 15 years old.  Appellant moved into A.P.'s house in 2013, roughly, along with appellant's mother and appellant's cousin, G.C.  When appellant first moved in, appellant shared the master bedroom with A.P.  A.P. moved out of the master bedroom when he met his fiancée, who also moved into the house with her son.  A.P. and his fiancée took over G.C.'s room, and G.C. moved into the master with appellant.  Appellant was in the midst of moving out when police arrested appellant.

{¶ 38} Appellant rested his case.  On March 25, 2016, the jury returned a verdict finding appellant guilty on nearly all counts.  Regarding C.S., the jury found appellant guilty of five[3] counts of rape, six counts of unlawful sexual conduct with a minor, and three counts of disseminating matter harmful to juveniles, and the trial court found appellant guilty of the sexually violent predator specifications.  Regarding R.H., the jury found appellant guilty of all ten counts of rape, and the trial court found appellant guilty

---

[3] The state dismissed count five of the indictment, one of the six counts of rape, at the close of evidence during trial.

of the attached sexually violent predator specifications. Regarding A.Y., the jury found appellant guilty of three counts of rape, three counts of gross sexual imposition, and three counts of importuning, and the trial court found appellant guilty of the sexually violent predator specifications. The trial court imposed an aggregate sentence of life without parole plus 76 years to life incarceration.

{¶ 39} Appellant filed a timely appeal to this court.

## II. ASSIGNMENTS OF ERROR

{¶ 40} Appellant presents two assignments of error:

> I. THE TRIAL COURT ERRED AND DEPRIVED APPELLANT OF DUE PROCESS OF LAW AS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE ONE SECTION TEN OF THE OHIO CONSTITUTION BY FINDING HIM GUILTY OF RAPE; GROSS SEXUAL IMPOSITION; IMPORTUNING; UNLAWFUL SEXUAL CONDUCT WITH A MINOR; AND DISSEMINATING MATTER HARMFUL TO JUVENILES AS THOSE VERDICTS WERE NOT SUPPORTED BY SUFFICIENT EVIDENCE AND WERE ALSO AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
>
> II. THE TRIAL COURT IMPROPERLY ADJUDICATED APPELLANT A SEXUALLY VIOLENT PREDATOR SINCE THOSE ADJUDICATIONS WERE NOT SUPPORTED BY SUFFICIENT EVIDENCE AND WERE ALSO AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

## III. STANDARD OF REVIEW

{¶ 41} Sufficiency of the evidence is a legal standard that tests whether the evidence is legally adequate to support a verdict. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). Whether the evidence is legally sufficient to support a verdict is a question of law, not fact. *Id.* In determining whether the evidence is legally sufficient to support a conviction, " '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *State v. Robinson*, 124 Ohio St.3d 76, 2009-Ohio-5937, ¶ 34, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. A verdict will not be disturbed unless, after viewing the

evidence in a light most favorable to the prosecution, it is apparent that reasonable minds could not reach the conclusion reached by the trier of fact. *State v. Treesh*, 90 Ohio St.3d 460, 484 (2001).

{¶ 42} In a sufficiency of the evidence inquiry, appellate courts do not assess whether the prosecution's evidence is to be believed but whether, if believed, the evidence supports the conviction. *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, ¶ 79-80 (evaluation of witness credibility not proper on review for sufficiency of evidence); *State v. Bankston*, 10th Dist. No. 08AP-668, 2009-Ohio-754, ¶ 4 (noting that "in a sufficiency of the evidence review, an appellate court does not engage in a determination of witness credibility; rather, it essentially assumes the state's witnesses testified truthfully and determines if that testimony satisfies each element of the crime"). Further, "the testimony of one witness, if believed by the jury, is enough to support a conviction." *State v. Strong*, 10th Dist. No. 09AP-874, 2011-Ohio-1024, ¶ 42. *In re C.S.*, 10th Dist. No. 11AP-667, 2012-Ohio-2988, ¶ 29, quoting *State v. West*, 10th Dist. No. 06AP-111, 2006-Ohio-6259, ¶ 16 ("[A] 'victim's testimony alone is sufficient to support the conviction for sexual assault.' ").

{¶ 43} "Even though supported by sufficient evidence, a conviction may still be reversed as being against the manifest weight of the evidence." *State v. McCombs*, 10th Dist. No. 15AP-245, 2015-Ohio-3848, ¶ 3, citing *Thompkins* at 387. "While sufficiency of the evidence is a test of adequacy regarding whether the evidence is legally sufficient to support the verdict as a matter of law, the criminal manifest weight of the evidence standard addresses the evidence's effect of inducing belief." *State v. Cassell*, 10th Dist. No. 08AP-1093, 2010-Ohio-1881, ¶ 38.

{¶ 44} When presented with a manifest-weight challenge, an appellate court may not merely substitute its view for that of the trier of fact but must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *Thompkins* at 387, citing *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). An appellate court should reserve reversal of a conviction as being against the manifest weight of the evidence for only the most " 'exceptional case

in which the evidence weighs heavily against the conviction.' " *Thompkins* at 387, quoting *Martin* at 175.

## IV.  DISCUSSION

### A.  First Assignment of Error

{¶ 45}  Under the first assignment of error, appellant contends that for each victim, the guilty verdict was not supported by sufficient evidence and was against the manifest weight of the evidence.  Appellant's assignment of error includes reference to convictions pertaining to rape, gross sexual imposition, unlawful conduct with a minor, importuning, and disseminating matter harmful to juveniles.

{¶ 46}  The offense of rape is codified in R.C. 2907.02, which states in relevant part:

> (A)(1) No person shall engage in sexual conduct with another who is not the spouse of the offender or who is the spouse of the offender but is living separate and apart from the offender, when any of the following applies:
>
> * * *
>
> (b) The other person is less than thirteen years of age, whether or not the offender knows the age of the other person.
>
> * * *
>
> (2) No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force.
>
> * * *
>
> (C) A victim need not prove physical resistance to the offender in prosecutions under this section.

{¶ 47}  Gross sexual imposition, pursuant to R.C. 2907.05, states in pertinent part:

> (A) No person shall have sexual contact with another, not the spouse of the offender; cause another, not the spouse of the offender, to have sexual contact with the offender; or cause two or more other persons to have sexual contact when any of the following applies:

> **(1)** The offender purposely compels the other person, or one of the other persons, to submit by force or threat of force.
>
> * * *
>
> **(4)** The other person, or one of the other persons, is less than thirteen years of age, whether or not the offender knows the age of that person.
>
> * * *
>
> **(B)** No person shall knowingly touch the genitalia of another, when the touching is not through clothing, the other person is less than twelve years of age, whether or not the offender knows the age of that person, and the touching is done with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person.
>
> * * *
>
> **(D)** A victim need not prove physical resistance to the offender in prosecutions under this section.

{¶ 48} The offense of "unlawful sexual conduct with [a] minor" is prohibited as stated in R.C. 2907.04(A): "No person who is eighteen years of age or older shall engage in sexual conduct with another, who is not the spouse of the offender, when the offender knows the other person is thirteen years of age or older but less than sixteen years of age, or the offender is reckless in that regard." The statute criminalizing "importuning" states, in relevant part, "[n]o person shall solicit a person who is less than thirteen years of age to engage in sexual activity with the offender, whether or not the offender knows the age of such person." R.C. 2907.07(A). The statute codifying the crime of "disseminating matter harmful to juveniles" proscribes that "[n]o person, with knowledge of its character or content, shall recklessly do any of the following: * * * [d]irectly sell, deliver, furnish, disseminate, provide, exhibit, rent, or present to a juvenile, a group of juveniles, a law enforcement officer posing as a juvenile, or a group of law enforcement officers posing as juveniles any material or performance that is obscene." R.C. 2907.31(A)(1).

{¶ 49} For purposes of sex offense statutes, "sexual conduct" is defined as "vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus

between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another."  R.C. 2907.01(A).  "Sexual contact" is defined as "any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person."  R.C. 2907.01(B).

### 1.  Convictions Arising From Conduct With C.S.

{¶ 50} Regarding C.S., appellant argues that the element of force for his rape convictions is not met.  The element of force is relevant to rape in C.S.'s situation because C.S. was 13 years old when the incidents allegedly took place.  Thus, R.C. 2907.02(A)(1)(b), the provision for rape of juveniles "less than thirteen years of age," is inapplicable, and, in this case, the state was required to prove that appellant "compel[led] [C.S.] to submit [to sexual conduct] by force or threat of force."  R.C. 2907.02(A)(2).

{¶ 51} "Force" is defined by statute as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing."  R.C. 2901.01(A)(1).  By statute, "[a] victim need not prove physical resistance to the offender."  R.C. 2907.02(C).  Rather, to prove the force element of a sexual offense, the state must establish force beyond that force inherent in the crime itself.  *State v. Griffith*, 10th Dist. No. 05AP-1042, 2006-Ohio-6983, ¶ 17, *discretionary appeal not allowed*, 113 Ohio St.3d 1514, 2007-Ohio-2208, citing *State v. Dye*, 82 Ohio St.3d 323 (1998).  Whether the force necessary to commit a sexual offense is proven depends on the circumstances of the case, including the age, size, and strength of the parties and their relation to each other.  *Griffith* at ¶ 17, citing *State v. Eskridge*, 38 Ohio St.3d 56 (1988).

{¶ 52} In cases involving figures of authority sexually abusing children in their care, " 'force need not be overt and physically brutal, but can be subtle and psychological. As long as it can be shown that the * * * victim's will was overcome by fear or duress, the forcible element * * * can be established.' "  *Griffith* at ¶ 17, quoting *Eskridge* at 58-59.  "[N]either express threat of harm nor evidence of significant physical restraint need be proven."  *State v. Czech*, 8th Dist. No. 100900, 2015-Ohio-1536, ¶ 39, *discretionary appeal not allowed*, 144 Ohio St.3d 1408, 2015-Ohio-4947, citing *Dye* at syllabus.  "Instead, it is the position of authority and power, in relationship with the child's

vulnerability, that creates a unique situation of dominance and control in which explicit threats and displays of force are unnecessary." *Czech* at ¶ 39, citing *Eskridge* at paragraph one of the syllabus. *State v. Kring*, 10th Dist. No. 07AP-610, 2008-Ohio-3290, ¶ 48, *discretionary appeal not allowed*, 120 Ohio St.3d 1420, 2008-Ohio-6166.

{¶ 53} In this case, appellant argues that appellee failed to present evidence of psychological compulsion that rises to the level of *Eskridge* and *Dye* because appellee introduced no evidence that appellant had supervisory or parent-like authority ("filial obligation") over C.S. (Appellant's Brief at 5.) Appellant cites to *State v. Schaim*, 65 Ohio St.3d 51 (1992), in support of his argument.

{¶ 54} In *Schaim*, the Supreme Court of Ohio found insufficient evidence to prove the element of force under *Eskridge* in the context of a pattern of incest between a father and his 20-year-old daughter where the state introduced no evidence that the adult victim believed the defendant might use physical force against her. Later, the Supreme Court in *Dye* considered both *Schaim* and *Eskridge* to determine whether a force specification contained within the rape statute was proven in the context of a 9-year-old boy who was allegedly raped by a trusted 44-year-old friend of the family. The court specifically noted that to "make a distinction on the basis of biology is wholly inappropriate and ignores the realities of our society." *Dye* at 329. The court then found that the adult friend of the family, with whom the boy was permitted to spend the night alone once a week for several months at the adult's house, did hold a position of authority over the boy and that force was proven beyond a reasonable doubt.

{¶ 55} Appellant seems to argue that the holding in *Dye*, extending *Eskridge* to non-parent-child relationships, is limited to cases involving victims under the age of 13 since, in *Dye*, the victim was 9 years old. However, our review of case law shows the rule of *Dye* clearly is applied with equal force in cases involving adults alleged to have committed sexual abuse against minors who are 13 or older. *See, e.g., Griffith* at ¶ 3; *State v. Kudla*, 9th Dist. No. 27652, 2016-Ohio-5215, ¶ 13, 34, 56; *State v. Clark*, 8th Dist. No. 101863, 2015-Ohio-3027, ¶ 29-30, 33.

{¶ 56} Moreover, the record of this case evidences that appellant did hold a position of authority over C.S. and purposely compelled C.S. to submit to sexual conduct by subtle and psychological force under *Eskridge* and *Dye*. A 30-year age disparity

separated appellant, who was about 43 years old in 2011, and C.S., who was 13 years old. The record includes a picture of C.S. in 2011, and C.S. testified to being smaller and skinny.  C.S. was permitted to go to various places alone with appellant, such as the mall, amusement parks, and a concert in another city, as well as stay the night with appellant repeatedly over a period of months.  During those times, appellant was apparently the only adult in charge of C.S.

{¶ 57} At the time he met appellant, C.S. was in a particularly vulnerable state: his mother had just passed away, he had never had a father figure in his life, he did not have many friends, and kids were bullying him at school.  According to C.S., appellant treated him like a little brother, like part of his family, and provided C.S. with many of the things his grandmother could not afford, such as new clothes and electronics.  Appellant gave C.S. a cell phone, put C.S. on his family cell phone plan, and paid the bill.  Sherfield, the interviewer at Nationwide Children's Hospital, testified that "grooming" behavior by adult sexual offenders includes such gift giving.  C.S.'s testimony showed how appellant leveraged buying C.S. things, and C.S.'s vulnerable emotional, social, and economic position into sexual compliance.  For example, when C.S. told appellant he did not have money to pay appellant back for things appellant bought, appellant said C.S. "owed him," sought sexual favors as payment, and would keep track of C.S.'s debts to prompt ongoing compliance to sex acts.  (Tr. at 480.)  C.S. told a consistent story to his school social worker, the Children's Hospital interviewer, and the original detective on his case.

{¶ 58} Furthermore, C.S. testified that he did not want to have sex with appellant but was confused by what was happening and thought if he did not comply, appellant would get mad and take his stuff away, and said appellant would sometimes get mad at C.S. when he did not come over.  According to Sherfield, C.S. reported that he did not say anything back to appellant when appellant told him to do sexual acts because he was scared and thought appellant would hurt him and reported he was prompted to talk about what happened after having a nightmare that appellant was going to kill him.

{¶ 59} Considering all the above, we disagree with appellant's argument that appellee failed to present evidence of force or threat of force, pursuant to *Eskridge* and *Dye*, to support the rape convictions.  Appellant does not present any argument regarding his convictions for unlawful conduct with a minor or disseminating matter harmful to a

juvenile relating to C.S.   As such, appellant has not met his burden to affirmatively demonstrate error on appeal regarding those convictions. *Watkins v. Holderman*, 10th Dist. No. 11AP-491, 2012-Ohio-1707, ¶ 11; *Abraham v. BP Exploration & Oil, Inc.*, 149 Ohio App.3d 471, 2002-Ohio-4392, ¶ 32 (10th Dist.) ("It is not the duty of this court to search the record for evidence to support an appellant's argument as to alleged error."); App.R. 16(A).   Therefore, appellant's arguments regarding C.S. lack merit.

### 2.  Convictions Arising From Conduct With R.H.

{¶ 60} Appellant contends that "no evidence was adduced at trial that he committed any offenses against R.H. after R.H.'s 12th birthday," contrary to the allegation in Counts 6, 7, 8, and 9 of the indictment.[4]   (Appellant's Brief at 7.)   As such, appellant contends those counts should be dismissed.

{¶ 61} A precise time and date of an alleged offense are ordinarily not essential elements of the crime.  *State v. Boyer*, 10th Dist. No. 06AP-05, 2006-Ohio-6992, ¶ 11, *discretionary appeal not allowed*, 113 Ohio St.3d 1492, 2007-Ohio-1986 (2007).  In cases alleging sexual misconduct involving a child, the state need not prove the offense occurred on an exact date.  *State v. Presley*, 10th Dist. No. 02AP-1354, 2003-Ohio-6069, ¶ 59; *State v. Draughon*, 10th Dist. No. 02AP-895, 2004-Ohio-320, ¶ 87, *appeal denied*, 102 Ohio St.3d 1461, 2004-Ohio-2569; *Boyer* at ¶ 11, citing *State v. Barnecut*, 44 Ohio App.3d 149, 152 (5th Dist. 1988) ("It is axiomatic that in cases involving sexual misconduct with a young child, precise times and dates of the conduct or offenses often will not be determined.").  *See also State v. Collinsworth*, 12th Dist. No. CA2003-10-012, 2004-Ohio-5902, ¶ 23 ("Under circumstances dealing with the memory of a child, reasonable allowances for inexact dates and times must be made."); *Presley* (noting this rule particularly applies where the crimes involve a repeated course of conduct over an extended period of time.) Furthermore, "[t]he inability of the state to produce such specific chronological information is without prejudice to the defendant provided that failure to allege or prove specific times and dates does not establish a material deterrent to the preparation of the defense."  *Boyer* at ¶ 11.

---

[4] Appellant expressly does not argue that the dates were elements of the offense or that he was prejudiced in his defense by the lack of specificity.

{¶ 62} Here, R.H.'s birthday is September 17, 2002. R.H. testified appellant performed oral sex on him almost every time he went over to appellant's house "from June to September," a period which lasted "sometime *after* [he] turned 12." (Emphasis added.) (Tr. at 327, 354.) R.H. was not sure exactly how many times appellant performed oral sex on him, but reported the number to be approximately 15 to 16 times. He finally told his mom about the abuse "around" his birthday. (Tr. at 325.) R.H. was examined at Nationwide Children's Hospital on November 26, 2014.

{¶ 63} On this record, we disagree with appellant that no evidence was presented that offenses against R.H. occurred after R.H.'s birthday, September 17, 2014. Therefore, appellant's argument regarding R.H. lacks merit.

### 3. Convictions Arising From Conduct With A.Y.

{¶ 64} Appellant contends that A.Y. was inconsistent, pointing to A.Y.'s initial statements during his interview at Children's Hospital, in which he denied that appellant's mouth touched his penis, compared to his later statements that appellant's mouth touched his penis "every day." (Appellant's Brief at 6.) Appellant also references A.Y.'s twice stating "[a]m I telling the truth?" during the Children's Hospital interview and stating that he was asleep while the assaults took place both during the interview and at trial. (Appellant's Brief at 6.)

{¶ 65} Initially, we note appellant's arguments regarding A.Y. challenge his credibility, which is a question of weight within the province of the jury. *West* at ¶ 20, citing *State v. Mullen*, 4th Dist. No. 93 CA 518 (Aug. 12, 1994) (any inconsistency in a child's testimony regarding sexual abuse is a matter of credibility for determination by the trier of fact); *State v. Martin*, 10th Dist. No. 05AP-818, 2006-Ohio-2749, ¶ 36-38; *In re Salyers*, 4th Dist. No. 97 CA 2312 (June 10, 1998) (discussing that children may have difficulty consistently reporting the number of times they were sexually abused out of fear, a "less acute sense of time," confusion, and inexact recollections due to their age). The trier of fact is free to believe or disbelieve any part of the witnesses' testimony. *West* at ¶ 20; *In re C.S.* at ¶ 31; *State v Antill*, 176 Ohio St. 61, 67 (1964). The rationale is that the trier of fact is in the best position to take into account inconsistencies, along with the witnesses' manner and demeanor and determine whether the witnesses' testimony is credible. *In re C.S.*

{¶ 66} The jury in this case was in the position to view A.Y. testify and apparently found him to be credible in determining that appellant committed the offenses as charged. We find no reason to displace the jury's conclusion in this case. Regarding A.Y. changing his answers in his interview with Combs, Combs testified that children often initially deny abuse before disclosing abuse to her. Moreover, A.Y.'s testimony at trial was largely consistent with what he ultimately reported to Combs. Although at trial A.Y. did not know exactly how many times appellant touched his penis with his hands and mouth, and the record contains inconsistencies on this account, the record as a whole demonstrates an ongoing course of conduct whereby appellant conducted oral sex and touched A.Y.'s penis with his hands for an extended period of time consistent with the time frames stated in the indictment. Therefore, on this record, appellant's argument regarding A.Y. lacks merit.

{¶ 67} Considering all the above, and after reviewing the evidence in the light most favorable to the prosecution, we conclude that a rational trier of fact could have found all the essential elements beyond a reasonable doubt. *Jenks*. Furthermore, after review of the record, we disagree that this is one of the exceptional cases where the jury clearly lost its way and created such a manifest miscarriage of justice that the convictions must be reversed. *Thompkins*.

{¶ 68} Accordingly, appellant's first assignment of error is overruled.

**B. Second Assignment of Error**

{¶ 69} Under the second assignment of error, appellant contends the trial court erred in adjudicating appellant a sexually violent predator under R.C. 2971.01(H) due to a lack of sufficient evidence and because that adjudication was against the weight of evidence. For the following reasons, we disagree.

{¶ 70} At trial, the state must prove beyond a reasonable doubt that a sexually violent predator specification applies to the offender. *State v. Carroll*, 10th Dist. No. 15AP-409, 2015-Ohio-5577, ¶ 47, citing *State v. Haynes*, 10th Dist. No. 01AP-430, 2002-Ohio-4389, ¶ 92, and *State v. Yoder*, 5th Dist. No. 2011-CA-00027, 2011-Ohio-4975, ¶ 48. An appellate court reviews a challenge of the evidence to support a conviction of a sexually violent predator specification under the sufficiency and manifest weight standards used to review the predicate conviction. *Carroll* at ¶ 47. Initially, we note that appellant's

argument under this assignment of error is constrained to whether the state introduced sufficient evidence to prove appellant is a sexually violent predator under R.C. 2971.01(H) beyond a reasonable doubt.  As such, we will likewise constrain our analysis to reviewing the sufficiency of the evidence.

{¶ 71} A "sexually violent predator" is defined by statute as "a person who, on or after January 1, 1997, commits a sexually violent offense and is likely to engage in the future in one or more sexually violent offenses."  R.C. 2971.01(H)(1).  A "sexually violent offense" includes gross sexual imposition involving victims under the age of 13 and rape. R.C. 2971.01(G) and (L).   For purposes of determining whether a person meets the definition of a sexually violent predator:

> [A]ny of the following factors may be considered as evidence tending to indicate that there is a likelihood that the person will engage in the future in one or more sexually violent offenses:
>
> (a) The person has been convicted two or more times, in separate criminal actions, of a sexually oriented offense or a child-victim oriented offense. For purposes of this division, convictions that result from or are connected with the same act or result from offenses committed at the same time are one conviction, and a conviction set aside pursuant to law is not a conviction.
>
> (b) The person has a documented history from childhood, into the juvenile developmental years, that exhibits sexually deviant behavior.
>
> (c)  Available information or evidence suggests that the person chronically commits offenses with a sexual motivation.
>
> (d) The person has committed one or more offenses in which the person has tortured or engaged in ritualistic acts with one or more victims.
>
> (e) The person has committed one or more offenses in which one or more victims were physically harmed to the degree that the particular victim's life was in jeopardy.
>
> (f)  Any other relevant evidence.

R.C. 2971.01(H)(2).

{¶ 72} Evidence sufficient to support even one of the factors listed in R.C. 2971.01(H)(2) is enough to affirm the trial court's finding that a defendant is a sexually violent predator pursuant to R.C. 2971.01(H)(1). *State v. Cartwright*, 12th Dist. No. CA2012-03-003, 2013-Ohio-2156, ¶ 27; *State v. Person*, 9th Dist. No. 27600, 2016-Ohio-681, ¶ 24. Furthermore, R.C. 2971.01(H)(2) is a "non-exclusive list of factors" that the trial court "may" use in making the determination that a defendant is likely to engage in sexually violent offenses in the future, and the trial court is free to consider "any other relevant evidence" as provided in the catchall provision of R.C. 2971.01(H)(2)(f). *State v. Sylvester*, 8th Dist. No. 103841, 2016-Ohio-5710, ¶ 12-13; R.C. 2971.01(H)(2).

{¶ 73} Appellant argues many of these factors are not present in the case to support the finding that he is a sexually violent predator. Specifically, appellant points to having no prior sexually oriented convictions, no documented history of sexually deviant behavior in his juvenile years, no proof that he commits crimes chronically with a sexual motivation, no proof he behaved in a manner that should be construed as tortious or ritualistic, no physical harm to the victims, and no other "catchall" evidence. (Appellant's Brief at 12.)

{¶ 74} In finding appellant guilty of the sexual predator specifications, the trial court focused primarily on two factors, R.C. 2971.01(H)(2)(c) and (f), stating:

> The Court has specifically considered the factors listed in 2971.01(H)(2). The available information in this case suggests that the person chronically commits offenses with a sexual motivation. There's been evidence that over a decade now [appellant] has been sexually abusing young males. The Court has also considered all the relevant evidence in terms of the grooming that took place, the building of a relationship of trust with these young men in order to act out sexually upon them.

(Tr. at 882.)

{¶ 75} We agree with the trial court. At trial, three child victims testified that appellant sexually abused them repeatedly over spans of several months. Appellant began abusing C.S. in 2011 and R.H. and A.Y. in 2014. Appellee offered testimony of a fourth child, A.D., to support the specification. A.D. testified that, when he was 15 or 16 years old, appellant put his mouth and hands on A.D.'s penis three or four times. Each of the

victims shared similar stories of grooming behavior: the boys had lost family members and had limited family resources, and appellant provided them with financial support and companionship.  In addition to the findings referenced by the trial court, we additionally note that appellant continued to sexually abuse young boys even after he was investigated regarding the allegations made by C.S.  On this record, we find sufficient record evidence that appellant is likely to engage in the future in one or more sexually violent offenses to support the specification pursuant to R.C. 2971.01(H).

{¶ 76} Accordingly, appellant's second assignment of error is overruled.

## V.  CONCLUSION

{¶ 77} Having overruled appellant's two assignments of error, we affirm the judgments of the Franklin County Court of Common Pleas.

*Judgments affirmed.*

DORRIAN and HORTON, JJ., concur.

_____